**UNITED TRANSPORTATION UNION, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Norfolk and Western Railway Company, Intervenor.**

No. 93–1639.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 21, 1994.

Decided Jan. 10, 1995.

Norton N. Newborn, Cleveland, OH, Atty., argued the cause, and filed the briefs, for petitioner.

Louis Mackall, Atty., I.C.C., Washington, DC, argued the cause, for respondents. On the brief, for respondents were Henri F. Rush, Gen. Counsel, and Judith A. Albert, Atty., I.C.C., Anne K. Bingaman, Asst. Atty. Gen., John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice, Washington, DC.

Jeffrey S. Berlin, Washington, DC, and William P. Stallsmith, Jr., Norfolk, VA, were on the brief, for intervenor.

Before: SILBERMAN, HENDERSON, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Petitioner challenges an ICC decision vacating an arbitration board's awards of protective pay allowances to railway employees who refused to exercise their seniority to take jobs at other locations after their prior jobs were abolished. We deny the petition.

## I.

The ICC is required under the Interstate Commerce Act (ICA), 49 U.S.C. § 11347 (1988), to condition its approval of railroad merger agreements on the inclusion of "fair and equitable" arrangements to protect employee interests. This case involves interpretation of the labor protective provisions in a Merger Agreement (the Agreement) and related Memoranda of Understanding (MOUs) negotiated by the Norfolk and Western Railway Company (N & W) and its labor unions at the time of the 1962 "Nickel Plate" merger between N & W and the former New York, Chicago and St. Louis Railway Company.

The Agreement incorporated the provisions of a previous labor protective agreement, the Washington Job Protection Agreement of 1936 (WJPA). Section 6(a) of the WJPA provides that employees will be deemed to be placed in a "worse position" and entitled to benefits from the carrier if, as a result of the merger, or "coordination," they are unable "in the normal exercise of ... seniority rights" to retain a position in

the merged system with compensation at least equivalent to that earned at the time of the Agreement. This protection was extended in § 1(b) of the Agreement to cover the employee's working lifetime with the carrier, beyond the WJPA's ordinary five-year limit. Section 1(b) also gave N & W the right to "transfer the work of the employees protected hereunder throughout the merged or consolidated system." This right was qualified by a MOU dated January 10, 1962, paragraph 5 of which specified that § 1(b) did not permit N & W to "transfer any employee (as distinguished from work) to another job within his craft or class beyond the same general locality as his point of employment . . . without the consent of his representative. . . ."

Petitioner brought this action on behalf of two groups of N & W employees whose jobs were abolished by the railroad. The "NKP group" includes two trainmen, one yardman, and one fireman in Indiana who lost their jobs in August 1989 due to a leasing and a crossing automation. The "WLE group" is composed of 40 firemen and trainmen who lost their positions after N & W sold a 166–mile section of Nickel Plate's Wheeling and Lake Erie District in Ohio in May 1990. The claimants were all Nickel Plate employees at the time of the Agreement, and all had seniority entitling them to take other N & W positions after their jobs were abolished. Rather than exercise their seniority, however, which might have required a geographic relocation, the employees submitted displacement claims under the Agreement, asserting that they did not have to accept other work beyond the general locality of their last place of employment. N & W denied the claims because it viewed the employees' failure to exercise seniority as a refusal to take available work that disqualified them from any allowances under the Agreement. In accordance with the Agreement, the dispute was presented to an arbitration board.

The arbitration board sustained the claims of all of the WLE group employees and two of the four NKP group employees. It held that requiring the WLE employees to travel up to 160 miles to relocate to jobs within their seniority district, but outside their "historic seniority division," would place the employees in a "worse position" within the meaning of § 1(b) of the Agreement unless the employer could demonstrate otherwise. And in ruling for two of the NKP employees, the arbitration board said that an individual is placed in a "worse position" as a result of a forced relocation "by having to travel an unreasonably long distance" to take a new job. N & W petitioned for ICC review of the arbitration board's awards under 49 C.F.R. § 1115.8 (1993).

The ICC vacated both decisions. *Norfolk & W. Ry. Co. and New York, Chicago & St. Louis Ry. Co.—Merger, Etc. (Arbitration Review)*, 9 I.C.C.2d 1021 (1993) (*N & W Merger*). The Commission reaffirmed its authority "to review arbitral awards arising from the labor protective conditions that the agency imposes upon its approval of mergers and other transactions embraced within 49 U.S.C. § 11343(a)." 9 I.C.C.2d at 1025. In *Chicago & North W. Transp. Co.—Abandonment*, 3 I.C.C.2d 729 (1987) (*Lace Curtain*), aff'd sub nom. *International Bhd. of Elec. Workers v. ICC*, 862 F.2d 330 (D.C.Cir.1988), the Commission had articulated its standard of review of arbitral awards interpreting Commission-imposed agreements. The ICC indicated it was concerned about "recurring or otherwise significant issues of general importance regarding interpretation of our labor protective provisions." *Lace Curtain*, 3 I.C.C.2d at 736. Accordingly, the ICC said it will vacate arbitral awards where "there is egregious error, the award fails to draw its essence from [the labor conditions], or the arbitrator exceeds the specific contract limits on his authority." *Id.* at 735 (citing *Loveless v. Eastern Air Lines, Inc.*, 681 F.2d 1272, 1275–76 (11th Cir.1982)).

Applying this standard, the ICC held that the arbitration board ignored the "essential bargain" of the Agreement, which requires employees to exercise their seniority to take available work anywhere should they ultimately be displaced. *N & W Merger*, 9 I.C.C.2d at 1027. Neither the "worse position" language of § 1(b) of the Agreement, nor paragraph 5 of the January 10 MOU, modified this obligation. The ICC concluded that the MOU's provision that employees need only follow *transferred* work within the

"general locality" of their employment does not affect the employees' obligations, as in this case, when their jobs are abolished.

## II.

Petitioner argues that the Commission exercised too aggressive a scope of review of the arbitration board's awards. The ICC should instead have limited itself to that review which a district court would apply to an award under the Railway Labor Act (RLA): a district court "may not ... set aside [an award] except for failure of the [Board] to comply with the requirements of [the Act], for failure of the order to conform ... to matters within the scope of the [Board's] jurisdiction, or for fraud or corruption by a member of the [Board] making the order." 45 U.S.C. § 153 First (q) (1982). We have previously described this standard as "amongst the narrowest known to the law." *Northwest Airlines, Inc. v. Air Line Pilots Ass'n Int'l,* 808 F.2d 76, 80 & n. 19 (D.C.Cir.1987), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988) (citing *Diamond v. Terminal Ry. Ala. State Docks,* 421 F.2d 228, 233 (5th Cir.1970)). The union was apparently confident that under that latter standard the awards would remain unscathed.

We are thus presented with one of those administrative law cases in which the decisive issue is the appropriate scope of review. But here the key question is the appropriateness of the scope of review the agency afforded the arbitration board. Petitioner argues that the ICC acted unreasonably (arbitrary and capricious) when it applied the *Lace Curtain* scope of review to the arbitration board's interpretations of labor protective provisions that had been *negotiated* by the carriers and the union—as opposed to those formulated by the Commission itself—and then merely adopted by the Commission.

The ICC's assertion in *Lace Curtain* of its jurisdiction to review arbitral awards, and the standards of review it applied, have been repeatedly upheld by this court. *International Bhd. of Elec. Workers v. ICC,* 862 F.2d 330, 335–38 (D.C.Cir.1988) *(IBEW); Brotherhood of Maintenance of Way Employees v. ICC,* 920 F.2d 40, 44–45 (D.C.Cir.1990);

*Railway Labor Executives' Ass'n v. United States,* 987 F.2d 806, 811–12 (D.C.Cir.1993) *(RLEA ).* Petitioner does not challenge the validity of *Lace Curtain* review *per se* (nor could it under existing caselaw); it argues rather that application of *Lace Curtain* standards is inappropriate if the Commission is called upon to interpret language that the parties themselves fashioned. An arbitrator is thought under those circumstances to have a comparative institutional advantage and therefore the. Commission should give the arbitrator the broadest possible deference.

The Supreme Court has insisted, however, that the Commission must oversee the appropriateness of labor protective provisions required by the statute even when negotiated by the parties. The Commission must incorporate those provisions into an order approving a merger or a like transaction and thereafter the Commission has the responsibility to ensure that those provisions are implemented. *See Norfolk & W. Ry. Co. v. Nemitz,* 404 U.S. 37, 42, 92 S.Ct. 185, 188, 30 L.Ed.2d 198 (1971). In other words, labor protective provisions, once incorporated into an ICC order, are more a matter of public than private law, unlike the ordinary collective bargaining agreement.

Still petitioner argues that, notwithstanding *Nemitz,* the most deferential scope of review of an arbitrator's interpretation of labor protective provisions must be employed here. The Commission itself, it is asserted, implicitly acknowledged as much in the *Lace Curtain* opinion by emphasizing that it had formulated the protective provisions at issue and therefore brought "special competence and expertise" to determine "whether our intent has been carried out," and that the Commission would "know best what we intended [the conditions] to mean." *See Lace Curtain,* 3 I.C.C.2d at 733. If the parties negotiate the protective provisions, no such Commission expertise can be brought to bear.

Petitioner has a point as to the language in *Lace Curtain.* Yet it was certainly open to the Commission to determine—as it did in this case—that its responsibility to ensure that labor protective provisions are applied in

accordance with statutory policy overrode any perceived lack of Commission expertise as to the meaning of the language in the provisions. That, after all, is the fundamental logic of *Nemitz*. Moreover, if the Commission were to adopt a different scope of review as to labor protective provisions that are bargained-for, as opposed to those fashioned by the Commission, considerable confusion would be created if, as is certainly likely, the provisions were a product of both processes. (In that regard, the Commission permits the parties to modify the provisions of a merger or like agreement through collective bargaining—but always subject to the Commission's approval.)

In sum, we think the Commission quite reasonably adopted the *Lace Curtain* scope of review of the arbitration board's awards. That standard is also deferential but somewhat less so than the RLA standard. The critical difference is that the *Lace Curtain* standard, like the standards applied by courts under the *Steelworkers Trilogy*[1] of cases, permits inquiry as to whether the arbitral award "draws its essence from the collective bargaining agreement." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960); *see Lace Curtain*, 3 I.C.C.2d at 735. In applying *Lace Curtain* in this case, the Commission vacated the awards "because they fundamentally misinterpret and fail to draw their essence from" the labor protective conditions. *N & W Merger*, 9 I.C.C.2d at 1027.[2]

 Petitioner alternatively argues that the Commission is clearly wrong: the arbitration board's awards do, in fact, draw their

1. *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

2. We note, *en passant*, as did the Commission, that petitioner did not explain why RLA review in particular is appropriate here. *See N&W Merger*, 9 I.C.C.2d at 1026 & n. 8. The Agreement does not incorporate RLA standards or provide for creation of an RLA Public Law Board to resolve labor disputes. In *United Transp. Union v. Norfolk & W. Ry. Co.*, 822 F.2d 1114, 1122

essence from the Agreement. Indeed, according to petitioner, the arbitration board's interpretation is the more plausible construction of ambiguous language. We do not reach this issue, however, because it was not raised by petitioner before the Commission, *see N & W Merger*, 9 I.C.C.2d at 1025 ("UTU's sole argument here is that *Lace Curtain* review is precluded because the disputed labor protective conditions were bargained-for rather than Commission-derived conditions ...."), and "claims not presented to the agency may not be made for the first time to a reviewing court." *Washington Ass'n for Television and Children v. FCC*, 712 F.2d 677, 680 (D.C.Cir.1983); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36–37, 73 S.Ct. 67, 68–69, 97 L.Ed. 54 (1952).

The petition for review is therefore denied.

(D.C.Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988), we held that where an arbitral award is "directly traceable to labor protective conditions imposed by the Commission in carrying out its responsibilities" under the ICA, "[i]t does not derive its vitality in any part from the RLA and there is no particular reason to suggest that it should be reviewed" under RLA standards. *Compare Brotherhood of Locomotive Eng'rs v. ICC*, 885 F.2d 446, 449 (8th Cir.1989) (ICC lacks jurisdiction to review arbitrator's award where parties' agreement specifically invoked RLA standards and court review procedures).